USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 96-1107

 ROGER RINGUETTE,

 Plaintiff, Appellant,

 v.

 CITY OF FALL RIVER, ET AL.,

 Defendants, Appellees.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Patti B. Saris, U.S. District Judge]

 Before

 Selya, Boudin and Lynch, 
 
 Circuit Judges.
 
 

 Brian R. Cunha with whom Brian Cunha & Associates was on brief
for appellant.
 Mary O'Neil, First Assistant Corporation Counsel, Law
Department, for appellees City of Fall River and Richard Levesque.
 Andrew B. Peppard and Borders, Littman & Peppard on brief for
appellee Richard Levesque.
 William G. Camara with whom William G. Camara, P.C. was on
brief for appellee Raymond Paradis.

June 4, 1998

 
 BOUDIN, Circuit Judge. Roger Ringuette brought this
action in the district court against the City of Fall River and
several police officers for medical injuries that he suffered,
through inattention by the police, while he was in police custody. 
He recovered a judgment against the city for negligence, but the
district court dismissed on qualified immunity grounds a "Fourth
Amendment" claim against two police officers.
 Save in one significant respect, the background facts
pertinent to the appeal are undisputed. On July 27, 1992, at about
7 p.m., police in Fall River, Massachusetts, responded to a report
of a disabled person and found Ringuette slumped over a car in a
stupor. According to the officers, Ringuette was unsteady on his
feet, had bloodshot eyes, and smelled of alcohol. Believing him to
be drunk, the police asked if he wanted a ride home. He replied,
"to my brother's" but gave no address. Asked if he wanted to go to
"detox," he gave the same answer.
 Later evidence indicates that Ringuette was suffering
from an overdose of prescription pills, although the police did not
know this at any relevant time. Not knowing how to contact
Ringuette's brother, the police took Ringuette into protective
custody pursuant to the Massachusetts Alcoholism Treatment and
Rehabilitation Act, Mass. Gen. Laws ch. 111B, 8. The police
handcuffed him, put him in the police car and drove him to the
station.
 Under section 8 of the Act, a person incapacitated by
alcohol is to be taken with or without his consent to his own
residence, to a treatment facility, or to a police station. If
taken to a police station, the officer in charge is to transfer him
to the nearest treatment facility, if available. The statute
continues:
 No person assisted to a police station
 pursuant to this section shall be held in
 protective custody against his will; provided,
 however, that if suitable treatment at a
 [treatment] facility is not available, an
 incapacitated person may be held in protective
 custody at a police station until he is no
 longer incapacitated or for a period not
 longer than twelve hours, whichever is
 shorter.

 In fact, Ringuette remained at the facility for more than
twelve hours--whether he was "held" after twelve hours is a
different question--and during this period he suffered serious
injury. Ringuette was booked into the police station at 7:19 p.m.
and assisted to a cell which was neither monitored by video camera
nor directly observable by the booking officer. No call was made
to the local treatment center; but according to later evidence, no
bed was then available, and the center had not admitted anyone from
the police station on short notice in the previous seven years. 
 During the night of July 27-28, Ringuette was monitored
by an officer at 15-minute intervals, as required by department
regulations. According to the officer, at around 5 a.m., the
officer found Ringuette standing in his cell and asked if he was
ready to be released; in reply, Ringuette swore at him. The
officer further testified that at the officer's last check, at 6:20
a.m., Ringuette said he was not ready to leave and was told that he
would nevertheless be released when the officer of the next shift
came on in about 15 minutes.
 Officer Paradis, one of the three individuals named as a
defendant in this case, took over as booking officer at 6:50 a.m.
on July 28 and was told of the prior conversation with Ringuette. 
Paradis knew Ringuette from prior periods of protective custody. 
According to Paradis, shortly after he came on duty, he asked
Ringuette if he wanted to leave, and Ringuette replied in "slurred"
speech: "I've got nowhere to go and I'm still half in the bag." 
Told of these events, Sergeant Levesque, who was then the
supervising sergeant, authorized Paradis to fill out a second
protective custody form, although the statute makes no reference to
a second form and provides for protective custody "for a period of
not longer than twelve hours."
 It appears that Paradis then checked on Ringuette only a
couple of times in the succeeding eight hours between 7 a.m. and
3 p.m., when Paradis was relieved by another officer. Throughout
his time at the police station, Ringuette was given neither food
nor water, despite the department handbook's policy requiring the
feeding of persons kept in protective custody for more than five
hours. At around 3 p.m., a new officer took over and found
Ringuette sitting and then lying on the floor. At this point,
Ringuette refused food and mumbled incoherently.
 Finally, at around 6 p.m. on the evening of July 28,
after Ringuette had been in the cell for almost 24 hours, the
police officer on duty realized that Ringuette was moaning and
making gurgling noises. Levesque called a medical technician who
arrived almost immediately and found that Ringuette was in a state
of shock, lying motionless in a pool of vomit, with eyes dilated
and his pulse racing. At the hospital, doctors found him to be in
severe shock--that is, having no measurable blood pressure--
severely dehydrated with several vital bodily functions impaired,
and suffering from a drug overdose of prescription pills and from
first and second degree burns (which are unexplained). 
 Ringuette now suffers from seriously impaired use of his
left arm and left leg, caused by "compartmental syndrome." This is
a muscle-tissue condition associated with tissue compression, in
this case due to lying in the same position for a long period and
compounded by the drug overdose. Expert testimony at trial
indicated that the condition likely occurred within three to six
hours prior to the technician's arrival. In the aftermath, Police
Chief McDonald filed charges against Paradis and Levesque and after
a hearing, both were found liable of derelictions.
 On June 2, 1993, Ringuette filed a 17-count complaint in
the district court, asserting various state law claims and federal
claims under 42 U.S.C. 1983. The defendants named in the
complaint were the city, Chief McDonald, officer Paradis and
Sergeant Levesque. On summary judgment, defendants obtained a
dismissal of a number of claims, Ringuette v. City of Fall River,
888 F. Supp. 258 (D. Mass. 1995), but several claims were reserved
for trial, and the issue of qualified immunity was not resolved. 
This summary judgment decision is not directly challenged on this
appeal, and we confine ourselves solely to the remaining claims
that were not then dismissed on summary judgment.
 After the summary judgment decision, the claim against
the city for negligence was left standing (state law barred such a
claim against the police officers). McDonald had been dismissed
from the case on summary judgment, but two constitutional claims
remained against Paradis and Levesque: a so-called "Fourth
Amendment" claim based on unlawful seizure, and a claim under the
Fourteenth Amendment's due process clause for deliberate
indifference to Ringuette's medical needs while in police 
custody. As to these claims, the district court said that it
could not resolve qualified immunity issues without factfinding and
sent the claims to trial. 888 F. Supp. at 266, 270.
 The case was tried over a number of days in October and
November, 1995. After the evidence was presented but before
submitting the case to the jury, the court withdrew the Fourth
Amendment claim on qualified immunity grounds, granting the
officers' motions for judgment as a matter of law; the court's
reasoning is set forth in a published memorandum. 906 F. Supp. 55
(D. Mass. 1995). The court then submitted to the jury, together
with a special verdict form, the Fourteenth Amendment claims
against the officers and the negligence claim against the city.
 By special verdict, the jury denied recovery against the
officers, finding that Ringuette had failed to prove that either
officer acted with "such recklessness as to constitute deliberate
indifference to Ringuette's serious medical needs." As to the
city, the jury found that it was liable for negligence and
eventually set damages at $1,780,360. Based on a statutory cap,
the court later reduced damages to $100,000. Mass. Gen. Laws ch.
258, 2. Ringuette now appeals, urging that the district court
erred in dismissing the Fourth Amendment claim against the officers
on grounds of qualified immunity. 
 The central issue on appeal is whether the district judge
properly sustained the defense of qualified immunity on the Fourth
Amendment claim, but we first face a threshold issue: Ringuette
says that while Levesque pleaded the defense in his answer to the
complaint, Paradis failed to do so and therefore waived it. 
Qualified immunity is an affirmative defense, Fed. R. Civ. P. 8(c),
and an affirmative offense is generally lost unless it is raised in
the pleadings. 5 C. Wright & A. Miller, Federal Practice and
Procedure 1278 (2d ed. 1990). 
 However, Ringuette waived his own procedural objection by
failing to assert it in the district court when the officers moved
for judgment as a matter of law on grounds of qualified immunity. 
Apparently, no one realized that Paradis had failed to assert this
defense. When Levesque's counsel renewed a general motion for
judgment as a matter of law after the close of evidence, a motion
previously joined in by all defendants, the district judge held
both officers protected by qualified immunity without
distinguishing between them. 906 F. Supp. at 58. After the jury
verdict, Ringuette's counsel moved for reconsideration on the
qualified immunity issue but argued it again on the merits without
suggesting that Paradis had waived the defense.
 Paradis' failure to assert the defense in his answer to
the complaint did not prejudice Ringuette, because Ringuette's
position on qualified immunity is the same as to both officers, and
he presented it to the district court both before the summary
judgment decision and after the ruling at trial. Had the waiver
objection been raised in the district court, Paradis would have had
a good chance of persuading the district judge to allow the defense
by an amendment to the answer. The issue, in short, was presented
to the court without objection and decided on the merits. 
Accordingly, Ringuette's procedural objection fails. Manchester
Gardens, Inc. v. Great West Life Assur. Co., 205 F.2d 872, 877
(D.C. Cir. 1953); Fed. R. Civ. P. 15(b).
 The merits of the qualified immunity defense, ably
analyzed by the district judge in her published opinion, are more
troublesome. At issue are Ringuette's claims that he was "seized"
by being detained by the police in protective custody, and that
this seizure became "unreasonable" under the Fourth Amendment when
a twelve-hour time limit under state law expired. On this double
premise, he sought damages for the medical injuries he suffered on
the ground that they flowed from a state actor's violation of his
federal constitutional right under color of state law. 42 U.S.C.
 1983.
 Under Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), the
police in their arrest and detention functions are normally
"shielded from liability for civil damages" under federal law
insofar as their conduct does not violate "clearly established"
rights of which "a reasonable person would have known." It is not
enough for the constitutional right to be "clearly established" at
a highly abstract level; what matters is whether in the
circumstances faced by the official, he should reasonably have
understood that his conduct violated clearly established law. 
Berthiaume v. Caron, __ F.3d. __ (1st Cir. 1998), 1998 WL 178384 at
*3. This qualified immunity standard leaves "ample room for
mistaken judgments." Malley v. Briggs, 475 U.S. 335, 343 (1986). 
 The district court said that while the issue was "far
from clear cut," "Ringuette's re-PC [i.e., the renewal of the
protective custody order after the first twelve hours] was a Fourth
Amendment seizure conducted without lawful authority, and
therefore, was unreasonable." 906 F. Supp. at 57. And while not
every violation of a state statute bearing on detention would
necessarily constitute an "unreasonable" seizure under the Fourth
Amendment, we agree with the district court that the statute's
twelve-hour limitation on protective custody was intended as a
fundamental limitation on state authority to detain Ringuette. 
 If Ringuette had gotten up after twelve hours and
demanded to be released, it is likely that a refusal to let him out
would have constituted not only a violation of the Fourth Amendment
but one that a reasonable Massachusetts police officer should have
known to be such a violation. Even without any direct precedent,
the explicit limitation in the state statute arguably made further
involuntary detention a constitutional violation clear enough--on
most facts--so as to negate any police claim of a reasonable
mistake. United States v. Lanier, 117 S. Ct. 1219, 1227-28 (1997). 
 The difficulty for Ringuette is that this leaves out half
of the story. Ringuette was not a citizen demanding to be released
from confinement. He was, from all appearances, still drunk or
otherwise incapacitated, and--according to the district court
findings--he rebuffed two offers to release him, one made shortly
before the end of the twelve-hour period and one made not long
thereafter. Nor did he later ask to leave. The notion that police
officers should simply have put Ringuette out on the street against
his will in his then-apparent condition is implausible.
 Thus, while Ringuette's further "confinement" can be
called an unreasonable seizure once the twelve-hour period had
passed, the unreasonableness was obviously mitigated by the offers
to release him, the belief that he remained incapacitated, and the
implicit willingness to let him go whenever he said he was ready. 
The police decision was neither at odds with "clearly established"
case law under the Fourth Amendment, nor so manifestly unreasonable
a "seizure" that any reasonable police officer should have regarded
it as such. That is enough for qualified immunity. Joyce v. Town
of Tewksbury, Mass., 112 F.3d 19, 22-23 (1st Cir. 1997).
 Having jailed Ringuette and left him in the cell, the
police not only assumed a duty of reasonable care--which the city
was found to have breached--but also in their later supervision
arguably exhibited a deliberate indifference to Ringuette's medical
needs so as to subject them to potential liability under the
Fourteenth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976);
Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st
Cir. 1990). The latter was at best a debatable claim since the
deliberate indifference standard is more than negligence. Manaritev. City of Springfield, 957 F.2d 953, 956 (1st Cir. 1992). In any
case, the jury squarely rejected it in its verdict in favor of the
police officers.
 Because the offers to Ringuette to release him and his
refusals are of importance, we note that these "facts" were not
entirely undisputed. Ringuette's brief refers to, but does not
develop, testimony by his medical expert at trial suggesting that
Ringuette was clearly incapacitated and perhaps incapable of speech
for the last several hours of his confinement and may have been so
incapacitated at an earlier period. Depending on how the doctor's
somewhat ambiguous testimony is read, it might be argued that this
testimony is in conflict with that of the two officers who said
that Ringuette was offered the opportunity to leave but twice
apparently declined.
 If so, the district court, in dismissing the Fourth
Amendment claim on qualified immunity grounds, resolved the dispute
in favor of the officers, concluding that the testimony
"demonstrated that . . . when attempts were made to release
Ringuette, he expressed a desire to remain there, or responded in
a way which the police officers believed indicated consent." 906
F. Supp. at 58. This finding is supported by testimony of two
different police officers, one of them not a defendant in the case,
and it is not directly challenged on appeal.
 Something of a "black hole" exists in the law as to how
to resolve factual disputes pertaining to qualified immunity when
they cannot be resolved on summary judgment prior to trial. To
avoid duplication, judges have sometimes deferred a decision until
the trial testimony was in or even submitted the factual issues to
the jury. See St. Hilaire v. City of Laconia, 71 F.3d 20, 24 n.1
(1st Cir. 1995), cert. denied, 518 U.S. 1017 (1996). In all
events, the district judge's procedure here, which is not
challenged on appeal, seems to us to have been eminently sensible.
 Affirmed.