Diane SOUZA, Plaintiff, Appellee,

v.

Ronald PINA, et al., Defendants,
Appellants.

No. 94–2079.

United States Court of Appeals,
First Circuit.

Heard Feb. 10, 1995.

Decided April 28, 1995.

William J. Meade, Asst. Atty. Gen., with whom Scott Harshbarger, Atty. Gen., was on brief, for appellants.

Kenneth C. Ponte, for appellee.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

In this 42 U.S.C. § 1983 proceeding, defendants-appellants, the former district attorney for Bristol County, Massachusetts, and three members of his staff (collectively, "appellants"), appeal from a denial of their motion to dismiss on grounds of qualified immunity. We now reverse.

## I.

### A. Standard of Review

We review a motion to dismiss *de novo*. *See, e.g., Armstrong v. Jefferson Smurfit Corp.*, 30 F.3d 11, 11 (1st Cir.1994). We accept the allegations of the complaint as true and, if the allegations are sufficient to state a claim for which relief can be granted, then the denial of a motion to dismiss will be upheld. *Id.*

### B. Factual Allegations and Procedural History

Plaintiff-appellee Diane Souza, mother of Anthony R. Degrazia, brought this action individually and as administrator of Degrazia's estate. The complaint contains the following factual allegations. During 1988 and 1989, nine young women were murdered in the New Bedford, Massachusetts area in

1. Souza also sought recovery under pendent state claims.

2. The other defendants-appellants are former first assistant district attorney Raymond Veary and former chief investigator Robert St. Jean.

3. At oral argument, Souza waived consideration of her claims arising under the Fifth and Eighth Amendments.

what became known as the "highway killings case." The Bristol County district attorney, appellant Ronald A. Pina, appointed himself as the chief prosecutor and investigator in the case. Pina and his press secretary, appellant James Martin, conducted numerous press conferences and other media interviews in which they caused or encouraged the media to link Degrazia to the highway killings case. The complaint alleges that appellants knew or should have known that Degrazia would take his own life as a result of these statements to the media. On July 27, 1991, Degrazia committed suicide.

On May 26, 1993, Souza commenced this action under 42 U.S.C. § 1983 [1] against Pina, Martin, and two other members of Pina's staff,[2] alleging that they violated Degrazia's constitutional rights under the Fifth, Eighth, and Fourteenth Amendments by denying him due process as well as his right to be free from "arbitrary and brutal punishment."[3] Appellants moved to dismiss, arguing that Souza had failed to state a claim upon which relief could be granted and that appellants were entitled to qualified immunity. By margin orders, the district court denied appellants' motion and their subsequent requests for reconsideration and for written findings.[4] This appeal followed.

## II.

### A. Jurisdiction

■ Our jurisdiction does not normally encompass appeals from the denial of a motion to dismiss. *See* 28 U.S.C. § 1291 ("[t]he courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts"). However, the denial of a government official's "dispositive pretrial motion premised on qualified immunity falls within a narrow exception to the finality principle and is, therefore, immediately appealable." *Buenrostro v. Collazo*, 973 F.2d 39, 41 (1st Cir.1992) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 524–30, 105 S.Ct. 2806, 2814–18, 86 L.Ed.2d 411 (1985)).

4. Although "findings of facts and conclusions of law are unnecessary on decisions of motions under Rule 12," Fed.R.Civ.P. 52(a), as we have observed before, some explication of the trial court's reasoning will often prove valuable to both the litigants and to the reviewing court. *Roque–Rodriguez v. Lema Moya*, 926 F.2d 103, 106 (1st Cir.1991).

## B. Qualified Immunity

■ The analytical path we traverse is well defined. Qualified immunity shields state officials exercising discretionary authority from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The "clearly established" inquiry necessarily incorporates "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The right must be stated with particularity. *See, e.g., Frazier v. Bailey*, 957 F.2d 920, 930 (1st Cir.1992). Otherwise, as the Supreme Court has observed, the generality at which courts identify the "clearly established" legal right threatens to "convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). For example, the Court noted, "the right of due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that a particular action is a violation) violates a clearly established right." *Id.* Such a level of generality, however, would defeat the objective reasonableness required by *Harlow*. *Id.* Accordingly, a right is "clearly established" if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. Additionally, implicit in the *Harlow* formulation quoted above is a temporal dimension: the right must have been clearly established at the time of the defendants' alleged improper actions, and a court may not find that the right was established through the use of hindsight. *See, e.g., Bailey*, 957 F.2d at 929.

The qualified immunity doctrine enables courts to weed out unfounded suits. *See Siegert*, 500 U.S. at 232, 111 S.Ct. at 1793. Thus, courts advance the central purpose of the doctrine, which is to protect state officials from "'undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, —— U.S. ——, ——, 114 S.Ct. 1019, 1022, 127 L.Ed.2d 344 (1994) (quoting *Harlow*, 457 U.S. at 806, 102 S.Ct. at 2732). Qualified immunity plays a critical role in striking the "balance ... between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984).

## C. Substantive Due Process

■ What we have delineated frames the remainder of our inquiry: we must determine whether Souza has alleged, with sufficient particularity, that appellants' allegedly improper conduct violated a clearly established constitutional right. We conclude that she has not.

In Count I of her complaint, Souza alleges that appellants' repeated statements to the press implicating her son violated his "right to be free from arbitrary and brutal punishment, and of his right not to be deprived of due process of law." At oral argument, Souza's counsel made clear that the thrust of the complaint was that appellants' actions violated Degrazia's rights to substantive due process.[5] Specifically, Souza claims that appellants "knew or should have known that Degrazia would take his own life as a result" of their statements to the press.

The Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The substantive component of due process protects against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d

---

5. Although at oral argument counsel waived consideration of recovery under procedural due process, because Souza's brief discusses violation of that right, we pause to address that theory. The first step in assessing a procedural due process claim is to determine whether state action has deprived the individual of a protected interest—life, liberty, or property. *See, e.g., Rumford Pharmacy, Inc. v. City of East Providence*, 970 F.2d

996, 999 (1st Cir.1992) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125–26, 110 S.Ct. 975, 983–84, 108 L.Ed.2d 100 (1990)). Souza makes clear that the protected interest in this case is Degrazia's life. However, as our discussion regarding substantive due process establishes, no state action led to the deprivation, and therefore, her procedural due process claims fails.

662 (1986). Souza points to no caselaw under which appellants' actions would constitute a violation of a clearly established right. Indeed, Souza's complaint presents no theory as to how the alleged conduct violated Degrazia's rights,[6] and her brief to this court offers only minimal argumentation on the point. Two broad possibilities exist, both implicated by Souza's complaint: first, appellants violated Degrazia's rights by actually inflicting harm; second, appellants violated Degrazia's rights by failing to prevent the infliction of harm. We explore each possible theory.

■ There is a constitutional right not to be deprived of life without due process of law. Thus, a state actor cannot murder a citizen. See, e.g., Estate of Gilmore v. Buckley, 787 F.2d 714, 720 (1st Cir.) (citing Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982)), cert. denied, 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986). Critically, however, Souza's complaint alleges no such direct state action. Instead, Souza alleges that because of appellants' statements to the press, Degrazia took his own life. Souza does not allege that the state actors did anything to harm Degrazia directly, nor does she allege that appellants in any way impeded Degrazia's ability either to seek treatment or otherwise avoid his injury. Simply stated, under the circumstances alleged here, there was no existing authority under which appellants could have been reasonably aware that statements made with the knowledge that Degrazia would take his own life would violate a clearly established right. Cf. Martinez v. California, 444 U.S. 277, 284–85, 100 S.Ct. 553, 558–59, 62 L.Ed.2d 481 (1980) (no constitutional deprivation of life when parole board releases parolee who commits murder five months later regardless of whether parole board's actions proximately caused murder under state law); see also Estate of Gilmore, 787 F.2d at 719 ("The [F]ourteenth [A]mendment ... does not protect against the deprivation of life by any person at all, but only against the deprivation of life by the state without due process.").

However, at the time of appellants' actions (as well as today), there were some circumstances under which a victim who dies at the hands of a private individual who is neither an agent of, nor employed by, the state nonetheless had clearly established rights to protection from harm. Estate of Gilmore, 787 F.2d at 719–23. Souza faintly argues that a "special relationship," and thus, a duty to protect, existed between appellants and Degrazia because first, they had knowledge of his suicidal tendencies and, second, by linking his name to the killings, Degrazia's freedom was limited "as greatly as if he were locked in maximum security." Souza's argument fails because the Supreme Court has made clear that the state has a duty to protect its citizens only when it affirmatively acts to restrain the "individual's freedom to act on his own behalf—through incarceration, institutionalization, or other restraint of personal liberty." DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989). As the Court explained:

[t]he [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

Id. In DeShaney, the Court held that county officials did not violate a child's due process rights when, despite repeated warnings, they failed to take action to protect the child from beatings by his father. The Court concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197, 109 S.Ct. at 1004.

■ We agree with appellants that their alleged statements fall outside DeShaney's bounds of constitutionally proscribed conduct. The complaint does not allege that, at

---

6. We limit our analysis to the alleged deprivation of life by appellants. We note that Souza did not specifically allege a liberty-deprivation claim under Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (state action damaging reputation plus other tangible loss may constitute cognizable deprivation of liberty interest) and its progeny. However, even if she had, because the complaint contains no allegation that appellants' statements to the press were false, a damage-to-reputation claim must fail. See, e.g., Powers v. Coe, 728 F.2d 97, 105 (2d Cir.1984).

any time, the government restricted Degrazia's liberty interests so as to give rise to an affirmative duty to protect. *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1006; *see also Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 991 (1st Cir.1992). Absent the kind of custodial relationship apparently contemplated by the Court, the Due Process Clause does not require the state to protect citizens from "private violence" in whatever form, including suicide. To be sure, the complaint alleges numerous acts by appellants that undoubtedly rendered Degrazia more vulnerable to danger in the sense that those acts may have exacerbated—or even brought about—Degrazia's suicidal tendencies. However, these are not the kind of "affirmative acts" by the state that would give rise to a constitutional duty to protect. *Cf. Monahan*, 961 F.2d at 992–93 (state official's knowledge of *voluntarily* admitted mental patient's propensity to jump out of automobiles gave rise to no constitutional duty to protect against a similar occurrence). Simply stated, appellants' actions did not "[restrain Degrazia's] freedom to act on his own behalf," *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1006, and thus they could not be reasonably aware that their actions violated Degrazia's clearly established rights.

■ Souza also argues that appellants' actions were "conscience-shocking," thus constituting a violation of the Fourteenth Amendment. In *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), the Supreme Court held that evidence obtained by pumping a criminal suspect's stomach against his will violated substantive due process because the state actor's conduct was so egregious as to "shock the conscience." Accordingly, in the usual course, a plaintiff may establish a substantive due process violation through "conscience-shocking" behavior. *See, e.g., Harrington v. Almy*, 977 F.2d 37, 43 (1st Cir.1992); *Amsden v. Moran*, 904 F.2d 748, 757 (1st Cir.1990), *cert. denied*, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). We conclude that appellants' actions do not rise to the level of

"conscience-shocking" conduct. Like the *Rochin* Court, we have found "conscience-shocking" conduct where state actors engage in extreme or intrusive physical contact. *See Harrington*, 977 F.2d at 43. While we do not foreclose the possibility that a government official's statements, *see Pittsley v. Warish*, 927 F.2d 3, 7 n. 3 (1st Cir.), *cert. denied*, 502 U.S. 879, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991), or other forms of psychological harm, may constitute a violation of a citizen's substantive due process rights, we find that the facts alleged here do not rise to that level.[7] That said, we pause to make clear that we do not condone the conduct alleged by Souza. In our system, prosecutors occupy a unique position of public trust:

> Between the private life of the citizen and the public glare of criminal accusation stands the prosecutor. That state official has the power to employ the full machinery of the state in scrutinizing any given individual. Even if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life. For this reason, we must have the assurance that those who would wield this power will be guided solely by their sense of public responsibility for the attainment of justice.

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 814, 107 S.Ct. 2124, 2141, 95 L.Ed.2d 740 (1987). Although "[s]tatements to the press may be an integral part of a prosecutor's job, and ... may serve a vital public function," *Buckley v. Fitzsimmons*, —— U.S. ——, ——, 113 S.Ct. 2606, 2618, 125 L.Ed.2d 209 (1993) (citation omitted), that function is strictly limited by the prosecutor's overarching duty to justice. We recognize that prosecutors face myriad pressures, especially in high profile cases. Nothing, however, diminishes the trust they hold.

A government official's plainly "despicable and wrongful," *Pittsley*, 927 F.2d at 7, conduct does not necessarily give rise to a recoverable federal civil rights claim against the official. This result obtains because, first, the conduct must violate a right secured by the Due Process Clause as authoritatively interpreted and, second, that right must be "clearly established" at the time of the official's conduct. In the end, Souza points to no

---

7. Moreover, as we have previously observed, if the lack of an affirmative exercise of state power forecloses a claim under *DeShaney*, then a plaintiff's "shock-the-conscience" argument is precluded. *Monahan*, 961 F.2d at 994 n. 7.

authority under which appellants would be reasonably aware that their alleged conduct would be unlawful. Because Souza has failed to establish that appellants' acts transgressed a clearly established right, we conclude that defendants may invoke the defense of qualified immunity.

### III.

For the foregoing reasons, the decision of the district court is

*reversed.* **Judgment shall issue for the defendants.**